Jamie S. Kilberg, OSB No. 110465
jamie@kauffmankilberg.com
KAUFFMAN KILBERG LLC
1050 SW Sixth Avenue, Suite 1414
Portland, OR  97204
Telephone:  (503) 224-2595
Facsimile:  (503) 224-3203

Attorneys for Defendant Rico Anthony Russell Rigutto

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 3:22-cr-00015-HZ |
| Plaintiff, | DEFENDANT'S SUPPLEMENTAL SENTENCING MEMORANDUM |
| v. | |
| RICO ANTHONY RUSSELL RIGUTTO, | Sentencing Date: May 9, 2025<br>Time: 10:00 a.m. |
| Defendant. | |

## <u>TABLE OF CONTENTS</u>

Table of Contents ................................................................................................ i

I.    INTRODUCTION ....................................................................................... 1

II.   ADVISORY GUIDELINES AND PRE-SENTENCE INVESTIGATION REPORT ....... 2

      A.    Mr. Rigutto Was a Minor Participant in the Drug Trafficking Here ..................... 2

            1.    There is Good Cause to Consider Mr. Rigutto's Objection ....................... 3

            2.    Mr. Rigutto Played a Minor Role ................................................ 4

      B.    Adjusted Advisory Guidelines Calculation ......................................... 8

            1.    The 2024 Sentencing Guidelines ................................................ 8

            2.    The 2025 Final Amendments .................................................... 9

III.  A 48-MONTH SENTENCE IS WARRANTED .............................................. 9

      A.    The Sentence Must Be No Greater Than Necessary to Achieve the Goals of
            Sentencing .................................................................................. 10

      B.    The Advisory Guidelines Range Is Too Harsh and Is Not Empirically Based ..... 11

      C.    Mr. Rigutto's Character and History Warrant the Requested Sentence .............. 13

            1.    Mr. Rigutto's Character and His Standing in the Community Warrant a
                  Reduced Sentence ........................................................... 14

            2.    The Lengthy Sentence Sought by the Government Would Have a
                  Deleterious Impact on His Children ......................................... 22

            3.    Mr. Rigutto Was a Youthful Offender ....................................... 23

            4.    Mr. Rigutto Has Zero Criminal History Points and Has a Very Low
                  Risk of Recidivism ........................................................... 24

IV.   CONCLUSION ......................................................................................... 28

Defendant Rico Anthony Russell Rigutto, by and through his attorney Jamie S. Kilberg, hereby files this Supplemental Sentencing Memorandum. On February 28, 2024, Mr. Rigutto's former counsel submitted a brief sentencing memorandum (ECF No. 63). This Supplemental Sentencing Memorandum is intended to supersede entirely that filing and provide additional information and arguments. Mr. Rigutto also incorporates and relies on the Second Confidential Supplement to the Presentence Report.

On March 13, 2025, Mr. Rigutto is scheduled to be sentenced following his guilty plea to one count of possession with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(vi). For the reasons set forth below, as well as those set forth in the Second Confidential Supplement to the Presentence Report, Mr. Rigutto respectfully requests the Court sentence him to 48-months' imprisonment, followed by a five-year term of supervised release.

## I.    INTRODUCTION

Mr. Rigutto is a 29-year-old father of six, ranging in age from 4 to 15, including two sets of twins. Prior to his involvement in the conduct here, he had no adult criminal record. He is a dedicated family man, loyal friend, and beloved community member. His involvement in this matter is a complete departure from the man he is, despite what his stepmother described as a difficult childhood prior to him coming to live with her and Mr. Rigutto's father when he was 14 years old. The stability Mr. Rigutto's stepmother said he desperately needed was finally fulfilled when he met his wife, Yolanda, nearly a decade ago. Helping to raise her three children brought him joy he never knew before. Mr. and Mrs. Rigutto eventually added to their family with three additional children.

He made a tragic mistake by letting himself get involved in the conduct at issue here—agreeing to store drugs in a locked safe in his outdoor shed and agreeing *once* to deliver them

when directed.  However, it does not define him, and he is not the dangerous, "extremely well-armed drug dealer" the government paints him to be (ECF No. 65 at 4).  On the literal eve of his prior sentencing date, Mr. Rigutto looked at his sleeping children and panicked.  He feared if the government got its way, his children would grow up not knowing their father other than as an incarcerated "drug dealer."  He slipped out of their Salem, Oregon, house that night and the next day failed to show up for his sentencing.  Though he was on abscond status and did not communicate with his pretrial services officer, he did not *flee*; he was later arrested without incident just a few miles away in Salem.  *See, e.g.*, *United States v. Figueroa-Alvarez*, 681 F. Supp. 3d 1131, 1137 (D. Idaho 2023) (distinguishing between flight and non-appearance).

He now comes before the Court, humbled.  He has always desired and intended to accept responsibility for his choices, regardless of the circumstances that led to him having the drugs in his shed, as described in more detail in the PSR and its supplements.  The government seeks too much, however.  Given all the circumstances, the appropriate sentence here is 48 months.

## II.    ADVISORY GUIDELINES AND PRE-SENTENCE INVESTIGATION REPORT

Mr. Rigutto's prior counsel posed no objections to the calculations in the Presentence Report ("PSR").  However, with new counsel having had an opportunity to review the PSR, a clear objection should have been lodged.

### A.    Mr. Rigutto Was a Minor Participant in the Drug Trafficking Here

Mr. Rigutto was a minor participant in what the government knows to be a substantial drug trafficking conspiracy involving fentanyl, methamphetamine, and heroin.  Accordingly, he is entitled to adjustments pursuant to U.S.S.G. §§ 2D1.1(a)(5) and 3B1.2(b).  Paragraphs 39, 41, 45, and 75 of the PSR should be modified accordingly.

**1.    There is Good Cause to Consider Mr. Rigutto's Objection**

As an initial matter, Mr. Rigutto recognizes that the failure to submit a timely objection

to the PSR calculations can forfeit such objection.  Fed. R. Crim. P. 32(f)(1) (requiring

objections be provided "within 14 days after receiving the presentence report").  Prior counsel

did not object to any aspect of the PSR.  The district court, however, has the discretion to waive

the timeliness requirement for good cause.  *United States v. Aguilar-Ibarra*, 740 F.3d 587, 591

(11th Cir. 2014); *see also* Crim. LR 32-1(a)(2)(B) (local rule permitting parties "for good cause"

and "[w]ith the approval of the Court" to waive the 14-day period and submit objections directly

to the Court without need for probation officer to respond or prepare addendum to PSR).

Here, good cause exists considering prior counsel's failure to file any significant

substantive arguments in favor of sentencing at all.  *See* ECF No. 63 (six-sentence sentencing

memorandum making no substantive arguments); *see also* ECF No. 64 (supplement to PSR that

spends 11 pages repeating nearly verbatim the provisions of the PSR; two pages arguing 18

U.S.C. § 3553(a) factors; and three-plus pages arguing COVID-19 related matters untethered to

any particular medical needs of Mr. Rigutto).

Prior counsel's failure potentially significantly prejudiced Mr. Rigutto, and he should be

permitted to present this argument before sentencing.[1]  In early March 2025, undersigned

counsel alerted the government of Mr. Rigutto's intent to present this objection in his sentencing

---

[1] The parties' plea agreement contains no agreements regarding whether the minor-participant adjustment does or does not apply.  Nor does it preclude Mr. Rigutto from seeking its application.  *See* ECF No. 53 ¶¶ 8-13 (detailing relevant conduct).  Instead, the agreement specifically notes that the identified Guidelines provisions are "estimates only"; it acknowledges that "the parties understand that the final guideline calculations . . . will be determined by the Court"; and it agrees that the "initial estimates" in the plea agreement "are not binding upon the parties."  *Id.* ¶ 12.  More directly, the plea agreement provides that "[t]here is no agreement as to . . . the applicability of any other Sentencing Guideline adjustments."  *Id.*

documents.  Counsel for the government raised no objections.  However, if the Court believes additional time is necessary for the government to present its position on this objection, such that the government is not prejudiced by its late assertion, Mr. Rigutto does not object to a further brief continuance of his sentencing hearing to allow the government additional time.

**2.    Mr. Rigutto Played a Minor Role**

Generally, a defendant is a minor participant in criminal activity if he is "substantially less culpable than the average participant in the criminal activity."  U.S.S.G. § 3B1.2 n.3(A).  Going forward, however, that formulation will likely no longer be required in drug cases.  Instead, starting in November 2025, the Sentencing Commission will direct courts to focus on "the facts of the particular case" and whether "the totality of the circumstances" in a drug case warrant a mitigating-role adjustment, "regardless of whether the defendant was substantially less culpable than the average participant in the criminal activity."  *See* U.S.S.G., *Amend. to the Sentencing Guidelines* at 14-15 (Apr. 30, 2025) (new § 2D1.1(e)(2)(B), scheduled to go into effect Nov. 1, 2025, clarifying intent for mitigating-role adjustment to be applied more frequently in drug cases) (hereinafter, the "2025 Amendments").

Either way, here, Mr. Rigutto's role was substantially limited, and he qualifies for the adjustment.  Under circumstances addressed more fully in the PSR and its supplements, he permitted a locked safe in his shed to be used as a *de facto* stash house, and he agreed one time to be a courier and deliver product from that shed as directed.  Though not charged as a conspiracy, the government does not contend that Mr. Rigutto was a source of supply or originator of the controlled substances found in his shed.  The Court must consider non-charged likely conspirators when assessing whether a defendant played a minor role.  *See, e.g.*, *United States v. Rojas-Millan*, 234 F.3d 464, 473 (9th Cir. 2000) (holding that, when measuring defendant's

culpability for purposes of minor-role consideration, court must compare defendant's involvement to that of all likely participants in criminal scheme); *United States v. Diaz*, 884 F.3d 911 (9th Cir. 2018) (same).

The current advisory Guidelines declare that "a defendant who is convicted of a drug trafficking offense, whose participation in that offense was limited to transporting or storing drugs and who is accountable under §1B1.3 only for the quantity of drugs the defendant personally transported or stored may receive an adjustment under this guideline." U.S.S.G. § 3B1.2 n.3(A).[2]  That description fits Mr. Rigutto precisely.

Among the factors the Court must consider in finding a defendant played a minor role are the following non-exhaustive factors:

> (i)    the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii)   the degree to which the defendant participated in planning or organizing the criminal activity;
>
> (iii)  the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
>
> (iv)   the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
>
> (v)    the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. § 3B1.2 n.3(C).  All these factors favor a minor-participant adjustment here.

---

[2] The quoted language from this commentary is deleted in the pending 2025 Amendments.  Instead, new subsection 2D1.1(e)(2)(B) would provide that, in drug cases, a minor-role adjustment is warranted "if the defendant's primary function in the offense was performing another low-level trafficking function"—other than "courier, running errands, sending or receiving phone calls or messages, or acting as a lookout" (which would qualify for a minimal-role adjustment).  *See* 2025 Amendments, § 2D1.1(e)(2)(B), at 14.

1.    There is no evidence Mr. Rigutto had any understanding whatsoever of the scope and structure of the drug trafficking organization.  Nor is there any evidence that, prior to his agreement to allow the drugs to be stored in his shed, Mr. Rigutto had any involvement in drug trafficking at all.  Instead, the evidence is that Mr. Rigutto was directed to store the drugs and deliver them—one time—as directed.  Mr. Rigutto reluctantly agreed.  To keep them away from his family, he purchased a large safe to which he alone had access, and kept it locked in his shed.

2.    There is no evidence Mr. Rigutto participated in the planning or organizing of any aspect of the drug trafficking—including the transaction that ultimately led to his arrest, which was arranged between a confidential informant and a source in Mexico.  There is no suggestion, much less evidence, that Mr. Rigutto set up any part of that transaction or that he had any contact whatsoever with any other member of the drug trafficking organization, other than the phone call he received directing him to make a delivery for someone.  Indeed, in support of a search warrant of Mr. Rigutto's home, law enforcement declared under oath that "it was unknown that he was going to be the individual delivering the controlled substances."  In other words, before he showed up as the courier for that delivery, law enforcement had no idea who Mr. Rigutto was, despite a lengthy drug-trafficking organization investigation.

3.    Mr. Rigutto is not alleged to have had any decision-making authority.  The evidence is that he was directed to store drugs at his home and was directed on December 14, 2021, to deliver a portion to a Walgreens parking lot.  Following Mr. Rigutto's arrest, law enforcement traveled to his home while securing a search warrant.  There, they happened upon several individuals in Mr. Rigutto's shed, apparently attempting to retrieve the remainder of their controlled substances.

4.      Mr. Rigutto's participation was limited.  He was directed to store large quantities of controlled substances at his home and was directed one time to deliver them.  He is precisely the kind of defendant described in the Guidelines as eligible for the minor-participant adjustment.  *See* U.S.S.G. § 3B1.2 n.3(A) (describing defendant "whose participation in that offense was limited to transporting or storing drugs").  Mr. Rigutto does not dispute that his ultimate agreement to store the controlled substances was an important part of the overall conspiracy here and provided what the rest of the conspirators believed to be a safe position— precisely because of Mr. Rigutto's otherwise lack of involvement.  But that does not preclude application of the minor-role adjustment.  *Id*. § 3B1.2 n.3(C) ("The fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative.").  The inquiry must always turn on the defendant's conduct as it relates to others involved in the same criminal activity.  *Id.*; *see also United States v. Sotopaz*, 131 F.3d 150 (9th Cir. 1997) (noting that while carrying "a substantial amount of [controlled substances] forecloses a minimal participation adjustment, it does not prevent an adjustment for minor participation").

5.      Finally, Mr. Rigutto stood to minimally benefit.  There is no allegation that Mr. Rigutto was paid some significant portion of the value of the substantial quantity of drugs left in his shed.  *See, e.g.*, *United States v. Diaz*, 884 F.3d 911, 918 (9th Cir. 2018) (remanding for resentencing to properly consider minor role reduction where there was "no evidence that [defendant] had a proprietary interest in the outcome of the operation").  Nor was Mr. Rigutto, for example, living an extraordinary or opulent lifestyle.  He was a stay-at-home father to his six children and stepchildren, and his wife was employed full-time at the time of the offense.

Mr. Rigutto was a minor participant in the overall drug trafficking conduct here.  He also expressly incorporates arguments contained in the Second Confidential Supplement to the PSR. He should be granted a two-point reduction under 3B1.2(b).

### B.    Adjusted Advisory Guidelines Calculation

Incorporating the minor-role adjustment would alter the Guidelines as calculated in the PSR.  However, it is an open question precisely *how* it ought to alter them.  As noted *supra*, on April 30, 2025, the U.S. Sentencing Commission provided Congress its 2025 amendments to the advisory Sentencing Guidelines.  In addition to altering when to apply the minor-role reduction as described above, the amendments also alter how the reduction is calculated.  While the amendments are not final until November 1, 2025, this section will set out both possibilities.

### 1.    The 2024 Sentencing Guidelines

Under the current advisory Guidelines, Mr. Rigutto's Guidelines would be calculated as follows:

| | |
|---|---|
| 2D1.1(a)(5) / (c)(2) – base offense level | 36 |
| 2D1.1(a)(5)(B)(ii) – Ch. 2 minor role adjustment | -3 |
| 2D1.1(b)(2) – possession of dangerous weapon | +2 |
| 2D1.1(b)(12) – maintained premises | +2 |
| 3B1.2(b) – Ch. 3 minor role adjustment | -2 |
| 3E1.1 – reduction for acceptance of responsibility | -3 |
| **TOTAL OFFENSE LEVEL** | **32** |

Mr. Rigutto has no adult criminal history, and zero criminal history points.  With a total offense level 32 and criminal history category I, the advisory Guidelines range, prior to other

adjustments, variances, and considerations, is 121-151 months, *substantially* less than the 210-262 months calculated by the PSR.

### 2.     The 2025 Final Amendments

Under the 2025 final amendments to the Sentencing Guidelines, defendants who are considered minor participants in drug-trafficking have their base offense level capped at 32. That is, between the Section 2D1.1(c) drug table and the adjustment for being a minor participant in Section 2D1.1(a)(5), a minor participant can score no more than 32.  *See* 2025 Amendments, § 2D1.1(a)(5), at 12-13.  Accordingly, under the 2025 Amendments, Mr. Rigutto's advisory Guidelines would be calculated as follows:

| | |
|---|---|
| 2D1.1(a)(5) / (c)(2) – base offense level | 32 |
| 2D1.1(b)(2) – possession of dangerous weapon | +2 |
| 2D1.1(b)(12) – maintained premises | +2 |
| 3B1.2(b) – Ch. 3 minor role adjustment | -2 |
| 3E1.1 – reduction for acceptance of responsibility | -3 |
| **TOTAL OFFENSE LEVEL** | **31** |

With a total offense level 31 and criminal history category I, the advisory Guidelines range, prior to other adjustments, variances, and considerations, is 108-135 months.

## III.     A 48-MONTH SENTENCE IS WARRANTED

The PSR recommends the Court impose a sentence of 210 months.  The government previously recommended a sentence of 87 months.[3]  Either recommendation *substantially*

---

[3] The government has informed undersigned counsel that, as a result of Mr. Rigutto's failure to appear for sentencing in 2024, it may (1) withdraw its recommendation that Mr. Rigutto receive a third acceptance-of-responsibility point under Section 3E1.1(b), and

exceeds what is reasonable or necessary here. As set forth in more detail elsewhere here and in the Second Confidential Supplement to the PSR, Mr. Rigutto's role in this case was that of a reluctant stash-house provider and courier. He had no control over the quantity of drugs he was instructed to store at his home, and he had little choice but to comply. Given all the circumstances here, a 48-month sentence is appropriate and no greater than necessary.

## A.    The Sentence Must Be No Greater Than Necessary to Achieve the Goals of Sentencing

Under the parsimony principle in Section 3553, Congress has instructed the courts that they "shall impose a sentence sufficient, but not greater than necessary, to comply with the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." *Dean v. United States*, 581 U.S. 62, 67 (2017); 18 U.S.C. § 3553(a). Even sentences within the advisory Guidelines range can be "greater than necessary" to serve the objectives of sentencing. *Kimbrough v. United States*, 552 U.S. 85, 111 (2007) (finding that district court's below-Guidelines sentence not unreasonable because "it appropriately framed its final determination in line with § 3553(a)'s overarching instruction to 'impose a sentence sufficient, but not greater than necessary to accomplish the goals' of sentencing"). While the sentencing courts "'must begin their analysis with the Guidelines and remain cognizant of them

---

(2) recommend that the Court increase his offense level by two points for obstruction of justice under Section 3C1.1. Notably, even following Mr. Rigutto's failure to appear and subsequent updating of the PSR, the Probation Office does not recommend the obstruction enhancement. Moreover, while "willfully failing to appear, as ordered, for a judicial proceeding," is identified as an example of the kind of conduct for which the enhancement could apply, *see* U.S.S.G. § 3C1.1 n.4(E), the exact same 2-point enhancement applies to defendants who threaten or intimidate a witness or juror, suborn perjury, create false documents at trial, destroy or conceal evidence, or provide materially false information to the Court or its staff. *Id.* § 3C1.1 n.4. Mr. Rigutto should not suffer the same effects for panicking on the eve of sentencing (*see* Second Confidential Supplement to the PSR for further details) that other defendants get who actively try to interfere in and thwart the judicial process through deceit, intimidation, threats, and lies.

throughout the sentencing process,'" *Molina-Martinez v. United States*, 578 U.S. 189, 198 (2016), the district judge "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007); *see also Nelson v. United States*, 555 U.S. 350, 352 (2009) (*per curiam*) (Guidelines are "not to be *presumed* reasonable").

Section 3553 requires the Court to consider several factors in determining an appropriate sentence, including: the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; the need for the sentence to afford adequate deterrence; the need for the sentence to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences available; the recommendations of the advisory Sentencing Guidelines; pertinent U.S. Sentencing Commission policy statements; the need to avoid unwarranted disparities in sentencing; and the need to provide restitution, if any.

**B.    The Advisory Guidelines Range Is Too Harsh and Is Not Empirically Based**

The applicable drug Guideline—and as a result, the advisory Guidelines range calculated for Mr. Rigutto—is excessively harsh and bears little correlation to the kind of empirically based sentences the Guidelines are supposed to provide. *See Gall*, 552 U.S. at 46-47 n.2 (noting that "the Sentencing Commission departed from the empirical approach when setting the Guidelines range for drug offenses, and chose instead to key the Guidelines to the statutory mandatory minimum sentences that Congress established for such crimes"); *United States v. Cabrera*, 567 F. Supp. 2d 271, 276 (D. Mass. 2008) (imposing sentence 65% below Guidelines range in drug distribution case; observing that "the Sentencing Commission has never explained how drug

quantity is meant to measure offense seriousness, and significantly, how it correlates with the purposes of sentencing under 18 U.S.C. § 3553(a)"; and criticizing Sentencing Commission for presuming "that drug quantity is somehow a proxy for culpability").

The problem of tying a sentence to certain objective measures independent of a defendant's actual role, such as drug quantity or purity, is heightened when the defendant had little knowledge of the scope of the operation or control over quantity. *United States v. Hayes,* 948 F. Supp. 2d 1009, 1025 (N.D. Iowa 2013). The court in *Hayes* specifically noted that quantity is a poor proxy for culpability, especially for co-conspirators who played a lesser role in the conspiracy. *Id.* at 1028.

To treat Mr. Rigutto at the same level (in terms of having the drug quantities drive the Guidelines range) as others in the trafficking organization (over which he had no control) who coordinated the acquisition, delivery, and distribution of substantially more quantities is particularly troubling; as the court in *Hayes* noted, "[the Sentencing] Commission organizes offenders on a continuum of decreasing culpability," with a mere driver being among the least culpable. *Id.* at 1029 (listing, in descending order of culpability as considered by the Commission, "High–Level Supplier/Importer," "Organizer/Leader," "Grower/Manufacturer," "Wholesaler," "Manager/Supervisor," "Street–Level Dealer," "Broker/Steerer," "Courier," and "Mule"). Mr. Rigutto was near the bottom of that continuum—he allowed the drugs to be stored in his shed, and he delivered them *one time* when and where he was told. Moreover, it is worth noting here that this was not an intercepted drug transaction in the classic sense. This entire transaction was set up using an informant. It was the informant—acting at the direction of and as an agent of the government—who determined what the quantity would be here.

In *United States v. Jaber*, 362 F. Supp. 2d 365 (D. Mass. 2005), the defendant in a drug conspiracy case was facing a Guideline sentence of 57 months—admittedly far less than what Mr. Rigutto faces here. The district court sentenced the defendant, instead, to *probation*, in part because the defendant "was [merely] a functionary" who "took orders from" his codefendant, and because the amount of drugs "that passed through his hands reflects someone else's decisions, not his own." *Id.* at 382. Those facts mirror Mr. Rigutto's situation precisely. *See also United States v. Cabrera*, 567 F. Supp. 2d 271 (D. Mass. 2008) (where defendant convicted of possession with intent to distribute drugs and faced Guidelines range of 70-78 months, court imposed sentence of 24 months in part because the Guidelines "focus largely on the quantity of drugs the defendant had, minimizing the significance of other relevant—and important—questions, like the defendant's real role in the offense or his background," which showed minimal involvement as one time errand boy and no prior criminal history).

Here, Mr. Rigutto played a minor role in the (uncharged) conspiracy. Indeed, prior to Mr. Rigutto showing up to deliver the drugs to the confidential informant, there is no evidence investigators even knew who he was. He had no control over the quantity or type of drugs he was directed to store in his shed. Over-reliance on the quantity here is not a fair proxy for Mr. Rigutto's culpability, and a strict application of the drug Guidelines does not allow for these factors to be fully considered. A Guidelines sentence, then, is unwarranted.

### C.    Mr. Rigutto's Character and History Warrant the Requested Sentence

Section 3553(a)(1) requires the Court to consider "the history and characteristics of the defendant." Mr. Rigutto is not the typical drug-trafficking defendant the Court has seen dozens, if not hundreds, of times. Mr. Rigutto is a deeply committed family man, who is well respected in the community. He overcame extraordinary odds, having been raised around drugs and crime

with challenging relationships with his own parents.  He turned that around to put family first; he was a stay-at-home dad to six children (three of his own and three stepchildren, all with his wife, Yolanda), modeling doing right by others, acting always with open and compassionate arms, and being inclusive.  He was relatively young when he committed these crimes, and he has no adult criminal history and very little risk of recidivism.  While he let his desire to always help family, even extended family, cloud his judgment, that decision does not fundamentally change the kind of man and father that he is.

### 1.     Mr. Rigutto's Character and His Standing in the Community Warrant a Reduced Sentence

Mr. Rigutto grew up in poverty, surrounded by drugs and gang-related activity.  His father was often incarcerated during his childhood, and his mother suffered from addiction. Mr. Rigutto's parents split shortly after his birth, and he initially lived with his mother.  Around age 4, he moved in with his aunt for reasons he still does not know.  PSR ¶ 55.  Mr. Rigutto's father was frequently incarcerated, and young Mr. Rigutto would visit him in custody.  Neither Mr. Rigutto nor his four younger siblings had any father figure in their early lives, and certainly not any stable male role model.

From age 6 to 14, Mr. Rigutto lived with his mother in Reno, Nevada.  That was fraught with problems, as she struggled with addiction and criminal behavior.  Mr. Rigutto himself started to get involved in the juvenile justice system as a young teenager in Reno, before relocating to Medford, Oregon, to live with his father and stepmother.  *Id.* ¶ 57.  Although his father continued to struggle with living a lawful life, Mr. Rigutto was fortunate that his father was in a relationship with a woman named Angela Elledge.  Ms. Elledge became Mr. Rigutto's *de facto* mother and quickly set about creating a loving and nurturing environment where, for the first time, he could experience the stability and unconditional love of a parent.  *See* **Exhibit 1**

Page 14   -    DEFENDANT'S SUPPLEMENTAL SENTENCING MEMORANDUM

at 1 (letter of support from Ms. Elledge) ("Rico Rigutto came into my life when he was 14 years old. As far as I am concerned, I am his mother. . . . A short time after Rico was sent to live with me his father went back to prison, so I took the role of being a parent to Rico without any help from his mother or father which I will continue to do for the rest of my life.").[4]

Finally, under the care of Ms. Elledge, Mr. Rigutto began to find himself. He began dealing "with the trauma of his childhood," *id.*, and learning how to redirect his life toward positive focuses. His number one priority became family. In 2016, at the age of 20, he met Yolanda Saracho. Two years later, they began dating. Yolanda had three children from a prior marriage, including a set of twins. Mr. Rigutto had found his calling: being a dad. Now married, Mr. and Mrs. Rigutto have three children of their own—including *another* set of twins!—bringing their family to eight.

Everyone in Mr. Rigutto's life could see the impact being a father had on him. Ms. Elledge observed that he "is a wonderful father to his 6 children," and that he "is respectful, dependable, and kindhearted." *Id.* His sister-in-law, in her letter of support, wrote that Mr. Rigutto took "my sister and her three kids in and accept[ed] them as his own." *Id.* at 5. He rejected the pressure that young men who grew up around drugs and crime often face to project a machismo image. Instead, he opted to be a family man. He became a stay-at-home dad to his stepchildren. His sister-in-law remarked how she "watched how he changed his life for them." *Id.* She praised Mr. Rigutto for being "a very hands-on parent" who "always put his family first." *Id.* She even noted that Mr. Rigutto "welcomed me and my three kids into his life as

---

[4] Many of the letters of support gathered in Exhibit 1 were written in support of Mr. Rigutto's request for release from custody earlier in the case. That is why several are dated in 2022 and why others have outdated ages or refer to Mr. Rigutto's wife as his fiancée or girlfriend (though they have been together for many years, they only formally got married in 2023).

well," and that neither her nor her "sister's kids had a father figure before Rico came into their lives." *Id.*; *see also id.* at 7 (Mr. Rigutto's friend, Carmen Rojas, writing that "the hat he wears best is being a dad!," and that he is "the best dad a kid could have growing up").  Mr. Rigutto "has opened his heart and has built a family that is inclusive . . . making sure kids grow up in an environment where they feel safe and loved"—something he lacked for many years as a child and early teenager.  *Id.* at 8 (Mr. Rigutto's friend, Rosa Gonzales's letter of support).

Mr. Rigutto's joy of being a dad and his commitment to being a good dad, is evident through the time, guidance, and commitment he gives his children:



Page 16   -   DEFENDANT'S SUPPLEMENTAL SENTENCING MEMORANDUM









His caring extends beyond his nuclear family. He has made strides to heal past wounds and restore broader family connections. After not seeing his younger brother, Charles, for about five years, Mr. Rigutto invited Charles to spend Christmas with his family. As Charles recounts, he "was nervous because we hadn't seen each other for so long that I was afraid that he wouldn't think I belonged around him." *Id.* at 2 (Charles Rigutto's letter of support). But his concerns were misplaced:

> I was completely wrong, my brother treated me as if we spent no time apart and I immediately felt at home with his fiancé and his 6 kids. After spending the Christmas holiday and New Years with him and seeing how he'd focused his time and energy into being an amazing father and having an impact on the lowrider community, he became my biggest role model. . . . My brother puts his family before anything and I know for a fact that if he could go back in time he would've never involved himself in anything to jeopardize losing the ability to raise his kids and take care of his family.

*Id.* His impact is felt on non-family members, too. Stacie Haight, a manager of a garden-supply store in Coos Bay and long-time friend of Mr. Rigutto, comments that he "is the first guy there when you need a helping hand, always, I mean always, there for his kids and he helps push me to be a better person every day. He pushes me to work hard to achieve goals, and succeed in life. He always makes sure you feel welcome and is the first to be there if you're feeling down." *Id.* at 11.

Notwithstanding the praise from family, extended family, and friends, the juxtaposition of a family-dedicated stay-at-home father who would do anything to protect his children, with the man who stands before the Court having agreed to store and ultimately deliver a significant quantity of drugs, is not lost on Mr. Rigutto. Those two things, however, are not irreconcilable, as described in depth in the Second Confidential Supplement to the PSR.

Mr. Rigutto is also deeply involved in the community. He loves cars and, as his brother foreshadowed above, particularly lowrider cars. He is a major part of the car club community in Salem, Oregon. He is a former president of the Salem Chapter of the Outbreak Car Club, a world-wide club for car enthusiasts. He has since formed his own car club, Original Boyz, which has grown to have chapters in four states and Australia. His kindness and helpfulness extend to his car club community. As his stepmother writes, "He is respected within the club and is always willing to help his fellow club members with perfecting their craft with their lowriders, pedal cars, and bikes." *Id.* at 1. One supporter who puts on car events for local charities, such as the Union Gospel Mission of Salem, writes that Mr. Rigutto "has always been a huge support to our shows and the community." *Id.* at 3 (letter of Sara Muzechenko). A fellow car club member writes about Mr. Rigutto's "positive and influential character," and describes Mr. Rigutto's generosity:

> When I was working on my bike for a show we went to in Reno,
> Nevada, he was always there to help me make sure my bike was in
> A1 condition, even if he felt he had to spend money out of his own
> pocket to help me with the bike, he did so with open arms. When
> we had to stay in Reno, he provided the housing without asking me
> for additional funds, knowing my status of income and
> professional stature. He does it and did it because he cares and
> truly cares for . . . his Outbreak family . . . .

*Id.* at 4 (letter of Michael Desantis).

Mr. Rigutto welcomed club members into his home if they had to travel to attend a show; he held potluck dinners for club members; and he "would hold weekly car meets at his house every weekend and he would take the time to help fellow car club members fix their cars to make sure they were always car show ready." *Id.* at 10 (letter of Austin Anderson); *see also id.* at 5 (Mr. Rigutto's sister-in-law writing that "When he's not with his kids he's with his lowrider club fixing his fellow club members cars, going to shows, or just having potlucks and having fun.");

Page 19  -  DEFENDANT'S SUPPLEMENTAL SENTENCING MEMORANDUM

*id.* at 6 (club member Nick Carmack writing how Mr. Rigutto invited him into his home to stay the night before a car show after "only knowing [me] for a short time," and how the next day he "was so thrown back [at the show] at how many people [Mr. Rigutto] knew from all walks of life"); *id.* at 10 (club member Austin Anderson writing that Mr. Rigutto has "always been there when I needed him, even if it was just helping me with my cars or giving me friendly advice").



One of Mr. Rigutto's potlucks for his club and friends



The Original Boyz car club

His participation in the car club community even attracted local media attention in Polk County, when he helped with a show there in August 2023, while this case was pending.  *See* **Exhibit 2** (Aug. 23, 2023, article in Polk County *Itemizer-Observer*, also <u>available online</u>).  In an interview for that article, Mr. Rigutto noted that he and his car club "try to get people together and teach the younger kids how to work on cars.  A lot of the local kids will see and learn too from us. . . .  We try to keep it going.  Older cars like this are dying down and without us to teach the younger kids, it's not going to go anywhere."  *Id.* at 2.


From the Polk County car show

Mr. Rigutto even finds ways to anonymously help his community.  Before the prior sentencing date, Mr. Rigutto noticed that someone had vandalized the Nelson Park Little Free Library near his home in Salem, knocking out the plexiglass and exposing the books inside to the

rain and elements. Mr. Rigutto anonymously took measurements and fashioned a new insert with a stylized sign for the Little Free Library.



He saw his community harmed and took action to protect an important, albeit small, community resource that his family and others utilized. This is a man who cares about his community.

### 2. The Lengthy Sentence Sought by the Government Would Have a Deleterious Impact on His Children

As noted, Mr. Rigutto was a stay-at-home father prior to this case. Not because he could not or did not want to work—he remained gainfully employed during his pretrial release, PSR ¶ 72—but because he loves being a dad. His six children, with the youngest being four-year-old twins, depend greatly on him for their emotional wellbeing and have been profoundly feeling his absence. His wife currently works 80-90 hours per week across three jobs—at Winco, Fedex, and Wells Fargo—and sells plasma twice a week to pay for their six children. A lengthy sentence like the kind sought by the government will only further harm Mr. Rigutto's family.

Page 22 - DEFENDANT'S SUPPLEMENTAL SENTENCING MEMORANDUM

*See, e.g.*, *United States v. Gauvin*, 173 F.3d 798 (10th Cir. 1999) (where defendant supported four young children and wife worked 14 hours a day and was barely able to provide for children, departure of three levels to 37 months warranted); *United States v. Owens*, 145 F.3d 923 (7th Cir. 1998) (where defendant in drug case "takes an active role in raising his children and supporting his family," downward departure from level 32 (169 to 210 months) to 120 months warranted). Mr. Rigutto looks forward to being able to relieve the pressure his wife and children are under by being gainfully employed upon his release.  Delaying that release some 10 years or more is unjust.

### 3.    Mr. Rigutto Was a Youthful Offender

At the time Mr. Rigutto committed the crime of conviction more than four years ago, he was 25 years old.  The Sentencing Guidelines encourage courts to consider a "defendant's youthfulness at the time of the offense or prior offenses."  U.S.S.G. § 5H1.1 (Nov. 1, 2024 ed.). The Guidelines specifically acknowledge that certain risk factors "may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships."  *Id.*  The Guidelines recognize that youthful individuals tend to be "more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood."  *Id.*  Importantly, the Guidelines also recognize the growing science around youthful offenders: they "are more amenable to rehabilitation."  *Id.*  Specifically, the Guidelines rely on the "age-crime curve, one of the most consistent findings in criminology," which "demonstrates that criminal behavior tends to decrease with age."  *Id.*  Accordingly, "[a]ge-appropriate interventions and other protective factors may promote desistance from crime," and the Court "may consider whether a

form of punishment other than imprisonment might be sufficient to meet the purposes of sentencing." *Id.*

Here, Mr. Rigutto grew up around crime and lacked proper guidance from either his mother, who was an addict, or his father, who was in and out of prison and was largely absent from his formative years. He got into juvenile trouble in Nevada, and he only began to turn things around when his stepmother entered his life during his teenage years. Although he was fully grown at the time he committed these crimes, he was still, according to all science available, at the outer edge of being a youthful offender.

The courts have long recognized what the Guidelines now do: youthfulness is a valid mitigating factor. *Johnson v. Texas*, 509 U.S. 350, 367 (1993) (holding that jury may consider a 19-year-old defendant's youth as a mitigating factor because "youth is more than a chronological fact," but is "a time and condition of life when a person may be most susceptible to influence and psychological damage") (quotation and citation omitted); *United States v. Naylor*, 359 F. Supp. 2d 521, 524 (W.D. Va. 2005) (sentencing youthful offender to 36% below Guidelines range (120 months instead of 188 months) in part because of defendant's numerous prior convictions were when he was teenager, and noting that "[j]uveniles have an underdeveloped sense of responsibility, are more vulnerable to negative influences and peer pressure, and their character is not as well formed as an adult's"). The Court should likewise consider Mr. Rigutto's relative youth as a mitigating factor.

### 4.    Mr. Rigutto Has Zero Criminal History Points and Has a Very Low Risk of Recidivism

In addition, Mr. Rigutto has no adult criminal history and has an extremely low risk of recidivism. As a first-time offender, the Court is empowered to—and should—reduce Mr. Rigutto's sentence to below the applicable Guidelines range. *See, e.g.*, *United States v.*

*Paul*, 561 F.3d 970, 973, 977 (9th Cir. 2009) (where defendant convicted of embezzlement and Guidelines called for 10-16 months' imprisonment, court's within-Guidelines sentence of 15 months unreasonably high in part because defendant was first-time offender with no criminal record).[5]

Even Mr. Rigutto's Criminal History Category I does "not fully account for his complete lack of criminal history" because a defendant with a *minor* criminal history still falls in the same category. *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009). *Autery* is particularly worthy of note. In that case, the defendant was convicted of possession of child pornography and faced an advisory Guidelines sentence of 41-51 months. The Ninth Circuit affirmed a probationary sentence in part because it was the defendant's first conviction. *Autery*, 555 F.3d at 874. Extra consideration for first-time offenders is warranted even though, at least nominally, the Guidelines already consider a lack of criminal history by assigning such defendants to Category I. *See United States v. Huckins*, 529 F.3d 1312, 1319 (10th Cir. 2008) (rejecting government's argument that Guidelines already consider first conviction and holding that "a district court may weigh a defendant's lack of a criminal record, even when the defendant has been placed into a criminal history category of I, in its § 3553(a) analysis").

The likelihood that defendant "will engage in future criminal conduct [is] a central factor that district courts must assess when imposing sentence." *Pepper v. United States*, 562 U.S. 476, 492 (2011). "Exemplary" performance on pre-trial release suggests a defendant is "unlikely to reoffend and [is] sufficiently deterred from future criminal activity." *United States v. Munoz-*

---

[5] Mr. Rigutto does not qualify for the 2-point reduction in Section 4C1.1 for being a zero-point offender because he possessed a firearm in connection with the offense of conviction. *See* U.S.S.G. § 4C1.1(a)(7). That does not change that being a first-time offender generally merits a variance from the advisory Guidelines.

*Nava*, 524 F.3d 1137, 1149 (10th Cir. 2008) (sentencing defendant facing Guidelines range of 46-57 months' imprisonment to one year and a day); *see also United States v. Baker*, 502 F.3d 465, 468 (6th Cir. 2007) (affirming probationary sentence for defendant facing 27-33 months after pleading guilty to possession of unregistered firearm that accidentally discharged during altercation with wife in part because defendant "had done 'exceedingly well' while under [pre-trial] supervision").

Mr. Rigutto performed "excellent" on pretrial release for a year-and-a-half, until the literal eve of sentencing, which is addressed more thoroughly in the Second Confidential Supplement to the PSR.  PSR ¶ 19.  He started on home detention, worked his way to curfew only, and eventually worked his way to having all electronic monitoring removed.  *Id.*  Until the very last moment, he was a model pre-trial releasee.

Besides a defendant's performance on pre-trial release, the Court and other stakeholders in the criminal justice system, including the Bureau of Prisons, employ risk assessment models as a tool to help gauge a defendant's risk of recidivism.  One of the most accessible risk-assessment tools is the BOP's Prisoner Assessment Tool Targeting Estimated Risk and Needs ("PATTERN").  The most recent version, version 1.3, came out in December 2021.  *See* National Institute of Justice, "[2021 Review and Revalidation of the First Step Act Risk Assessment Tool](#)" (last visited April 25, 2025) (hereinafter "PATTERN v1.3").  Applying the PATTERN v1.3 analysis for Mr. Rigutto yields the following results for a "General Male" defendant:

| Factor | Score |
|---|---|
| **Current age (29)** | **+28** |
| Walsh Act conviction (no) | 0 |
| Violent offense (no) | 0 |
| Criminal History Points (0) | 0 |

| Factor | Score |
|--------|-------|
| History of escapes (none) | 0 |
| History of violence (none) | 0 |
| Education status (not enrolled) | 0 |
| **Drug program status (no need, see PSR ¶ 70)** | **-6** |
| All incident reports (none) | 0 |
| Serious incident reports (none) | 0 |
| Time since last incident report (N/A) | 0 |
| Time since last serious incident report (N/A) | 0 |
| Financial responsibility refuse (no) | 0 |
| **Programs completed (2-3, *see* Exhibit 3 (certificates of completion for Mindfulness and Coping programs))** | **-6** |
| Work programs completed (none) | 0 |
| **TOTAL** | **16** |

*See* PATTERN v1.3 at 17-18.

A "General Male" defendant with 16 points in the PATTERN analysis is classified as a "Low" risk of recidivism. *Id.* at 19 (male defendants with 12-32 points considered "Low" risk of recidivism). Once he arrives at his designated facility and can begin additional programming and education, he can quickly reduce his "Low" risk scoring to "Minimum": *Enrolling* in GED courses will reduce his score by one point, *completing* his GED will reduce it by yet another point, and completing just *one more* program will reduce his score by another three points. *See id.* at 18; *see also id.* at 19 ("Minimum" risk cut-off at 11 points). And even if he completes *no* more programming, as soon as he turns 30, he will be considered "Minimum" risk. *See id.* at 17 (score automatically reduces by 7 points beginning at age 30). The entirety of his (positive) PATTERN points come simply from his age, as reduced by his lack of drug abuse and the work he has engaged in to-date while in detention, where programming is virtually non-existent.

Page 27   -   DEFENDANT'S SUPPLEMENTAL SENTENCING MEMORANDUM

Mr. Rigutto's BOP-verified low risk should factor heavily in the Court's determination of what an appropriate sentence should be.[6] *See, e.g.*, *United States v. Wachowiak*, 412 F. Supp. 2d 958 (E.D. Wis. 2006), *aff'd* 496 F.3d 744 (7th Cir. 2007) (varying over 40% from recommended Guidelines range, in part because § 3553(a)(1) "requires the court to consider the character of the defendant, [while] the guidelines account only for criminal history," and where "defendant led an otherwise praiseworthy life," had a low risk of recidivism, and had strong family support).

## IV.    CONCLUSION

Mr. Rigutto is not the heavily armed drug dealer that the PSR and the government would lead the Court to believe he is.  Factoring in Mr. Rigutto's history and background, a sentence within the calculated Guidelines range is excessive.  The details of his history and background, including his legal collection of firearms as a lawful gun enthusiast, are contained within the Second Confidential Supplement to the PSR, which is incorporated herein.  For all the reasons set forth herein and in the PSR and its supplements, a sentence of 48 months is sufficient without being more than necessary under these circumstances.  It is what the Court should impose.

DATED:  May 2, 2025.

KAUFFMAN KILBERG LLC

_____
JAMIE S. KILBERG, OSB No. 110465
Telephone:  (503) 224-2595

Attorneys for Defendant Rico Anthony
    Russell Rigutto

---

[6] Notwithstanding his classification as a "Low" risk of recidivism, Mr. Rigutto still likely qualifies for placement in a *minimum*-security camp when applying the BOP's separate Inmate Load and Security Designation calculation.